IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

SHENOUDA S. ABDEL-MALAK, *et al.*,

        Plaintiffs,

v.

JP MORGAN CHASE BANK, N.A,

        Defendant.

Case No. AW—10–2051

## MEMORANDUM OPINION

Pending before the Court is Plaintiffs' Shenouda S. Abdel-Malak and Shahla Abdel-Malak. Motion for Preliminary Injunction (Doc. No. 14) against Defendant, J.P. Morgan Chase Bank. The Court held a hearing on this Motion on September 14, 2010. The parties were permitted to fully brief their positions and the Court has considered the arguments asserted therein. For the reasons articulated below, the Court **DENIES** Plaintiff's Motion for Preliminary Injunction.

**I .**    **FACTUAL AND PROCEDURAL BACKGROUND**

The Plaintiffs in this case, Shenouda S. Abdel-Malak and Shahla Abdel-Malak (the "Plaintiffs"), are residents of Maryland. They have filed claims against the Defendant, JP Morgan Chase Bank, a corporation which is a citizen of both the states of New York and Delaware. Plaintiffs are facing imminent foreclosure on their mortgage, and they are asking this Court to enjoin the foreclosure proceedings that Defendant Chase Bank will institute if a preliminary injunction is not granted. The facts giving rise to their claim are outlined below.

In 2006, Plaintiffs constructed a home on the lot identified as 7012 Bradley Boulevard, located in Montgomery County, Maryland. Plaintiffs had previously taken out a construction loan to finance the construction cost of the residence. In November 2007, Plaintiffs secured a mortgage from Defendant Chase, in order to replace the construction loan. This mortgage with Chase is at issue in this case.

Plaintiffs allege that when they completed the construction of their home in November 2007, they owed approximately $2.5 million on the construction loan that they had taken out prior to building their residence. Consequently, they secured a loan through Washington Mutual Bank (now JP Morgan Chase), which offered an adjustable mortgage interest rate. Plaintiffs allege that they were given a loan repayment schedule by Washington Mutual Bank. This loan repayment schedule authorized the Plaintiffs to make a monthly payment in the amount of $7,455.26. (Doc. No. 2 at 3). This payment comprised two components—$6,621 constituted both the principle and interest on the loan, and an amount of $834.13 constituted Plaintiffs' monthly escrow payment. *Id.* Plaintiffs aver that the loan disclosures, notes, and riders offered by the Defendant only alerted them to the "mere possibility" of negative amortization under the above-described payment schedule. However, Plaintiffs assert, under this payment schedule, negative amortization was certain to occur if they made the minimum payment amounts outlined in the schedule. Plaintiffs contend that the lack of disclosure as to this certain result violated the Truth in Lending Act (TILA), 12 C.F.R. §226.17 (2010), et. seq. Moreover, Plaintiffs allege that, at the time of closing, Defendant failed to provide them with sufficient notice of their right to cancel their mortgage in accordance with TILA. Supporting their claim, Plaintiffs assert that Defendants gave them only one copy of their notice of the right to rescind their mortgage as opposed to the two copies required under TILA. *Id.* Plaintiff alleges that two copies of this

notice should have been given to both Mrs. Abdel-Malak and Mr. Abdel-Malak, resulting in a total of four copies of the notice that should have been given to Plaintiffs. As only one copy of this notice was given, Plaintiffs allege that Defendants violated the notice requirements under TILA. *Id.*

In connection with the closing on their mortgage, Plaintiffs received a notification informing them of the amount that they would be required to pay in escrow each month. Defendants alerted Plaintiffs that they would be required to pay $834.13 a month in escrow from January 2008 until December 2008. This amount was reflected in the statement entitled "Estimated Initial Monthly Payment." This statement indicated that the escrow amounts of $524.96 and $309.17 were the estimated taxes and fire and earthquake insurance payments respectively. Furthermore, this statement indicated that these amounts were "Based on the best information available at this time regarding [Plaintiffs'] real estate taxes and insurance requirements . . . ." (Ex. 8). The statement also gave the following disclosure concerning Plaintiffs' escrow obligations:

> An escrow analysis will be performed and you will be sent an Initial Escrow Account Statement within 45 days of settlement. This statement will disclose what is *estimated* to be received and disbursed from your escrow account over the next 12 months.
>
> . . . .
>
> As a result of performing the escrow analysis, your monthly mortgage payment may be adjusted, and perhaps increased. If a new payment is required, it will be reflected on the Initial Escrow Account Statement and on your monthly statement.

(Plaintiffs' Ex. 8) (emphasis added). Plaintiffs allege that Defendants based the escrow amounts featured on this statement on the unimproved value of the land. According to Plaintiffs, in September 2008, Defendant Chase alerted Plaintiff to the fact that a shortage existed in Plaintiffs' escrow account in the amount of $26,955.33. Plaintiffs recall that Defendants

informed them that the taxes on the property had increased, leading to an increase in Plaintiffs' escrow obligation. Plaintiffs state that Defendants required them to pay the shortage amount in a lump sum and have their monthly mortgage payment increase to $9, 701.54, or alternatively, pay a monthly mortgage payment of $11,947.82 if the shortage amount was not paid in full. Plaintiffs take the position that the Defendant was aware of the certainty of an escrow payment increase at the time that the Plaintiffs closed on their mortgage but intentionally failed to disclose this certainty. Supporting their contention, Plaintiffs claim that they had an appraisal performed that valued the property in question at $3.6 million, but Defendants based their initial escrow estimate on the value of the property before the mortgaged lot was improved. By failing to qualify that the escrow estimates given to Plaintiffs at the time of closing were based on the amounts of Plaintiffs' unimproved lot (the value of the lot without the existence of the Plaintiffs' home), Plaintiffs believe that Defendants made deliberate misrepresentations with respect to Plaintiffs' monthly escrow obligations on which they intended the Plaintiffs to rely.

Relevant to the motion at bar, Plaintiffs allege that they fell behind on their mortgage payments when they were alerted of the increase in escrow payments. Plaintiffs put their home on the market in hopes of selling the home at full value, but Defendants intend to initiate foreclosure proceedings on the home. If the preliminary injunction is not granted, Plaintiffs allege, Defendants will initiate foreclosure proceedings on their home, an act that will eventually prohibit Plaintiffs from selling their home at full value. In addition to attempting to sell their home, Plaintiffs have also attempted to rescind their mortgage but claim that Defendants failed to respond to their attempts.

Plaintiffs originally filed this case in the Circuit Court for Montgomery County, Maryland. On July 22, Plaintiffs filed an Emergency Motion for a Temporary Restraining

Order/and or Injunction in the Circuit Court for Montgomery County, requesting that the court enjoin Defendants from initiating foreclosure proceedings on their home. Defendants filed a Notice of Removal to this Court on July 28, 2010. On July 30, the Plaintiffs filed an Emergency Motion for a Temporary Restraining Order (TRO) in this Court. The Court held a telephonic hearing to decide on the Motion for TRO. Subsequently, the Court issued an order denying this Motion. After their Emergency Motion for TRO was denied, Plaintiffs filed a Motion for Preliminary Injunction on August 11, 2010. On September 14, 2010, a hearing was held on the Motion for Preliminary Injunction, the motion at bar.

## II. STANDARD OF REVIEW

As articulated in a recent Fourth Circuit case, "[a] preliminary injunction is an extraordinary remedy afforded prior to trial at the discretion of the district court that grants relief pendente lite of the type available after the trial." *Real Truth About Obama, Inc. v. Fed. Election Comm'n,* 575 F.3d 342, 345 (4th Cir.2009) (citations omitted). Under the new standard for preliminary injunctions, the plaintiff must establish that "(1) he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest." *Id.* at 346. The Fourth Circuit, emphasized that this standard is more stringent than the prior standard and that plaintiffs must clearly show that they are likely to succeed on the merits and to suffer from irreparable harm before such an extraordinary relief for an injunction may be awarded. *Id.* at 346-347.

## III. ANALYSIS

a. Likelihood of success on the merits of Plaintiffs' Claims

    i. COUNT V: Truth in Lending Act Violations

5

### i. Plaintiffs Claim that Defendant Failed to Disclose Information Regarding Negative Amortization required by Both TILA and Maryland Law

Plaintiffs allege that Defendant failed to disclose information regarding negative amortization which was required under both TILA and Maryland law. In the case at bar, Plaintiffs request that the Court grant the equitable remedy of rescission of the loan between Plaintiffs and Defendant Chase, as Plaintiffs contend that "rescission of the loan at issue will provide the Plaintiffs with significant equity in their home." (Doc. No. 26). As this Court recognized in *Benjamin v. Nationwide Lending Corp.*, "Generally, the framework for the rescission procedure under TILA requires that the creditor, within 20 days from the obligor's notification of rescission, return any money the obligor provided and to take action to terminate the security interest. After the creditor performs its obligations under the TILA, the obligor must tender any property back to the creditor and if impracticable or inequitable, the obligor will tender the reasonable value. However, under Fourth Circuit precedent the right to rescind 'remains any equitable doctrine subject to equitable considerations.'" No. AW-08-2511, 2010 WL 610768, *3 (Feb. 16, 2010), (quoting *Am. Mortgage Network, Inc. v. Shelton*, 486 F.3d 815, 819 (4th Cir. 2007).

Plaintiffs allege that the "a lender violates TILA, 12 C.F.R. §226.17 and 12 C.F.R. §226.19, by describing the impact of a negative amortization mortgage as a possibility, when in fact there is an absolute certainty of negative amortization under the loan." *Id.* at 7-8. When they closed on their mortgage, Plaintiffs contend that the documentation describing their mortgage indicated that the mortgage that they had chosen had a *possibility* of negative amortization, when in fact, there was an absolute *certainty* of negative amortization. Failing to disclose this certainty has resulted in the Defendant violating TILA, according to Plaintiffs.

Under the Truth in Lending Act, 12 C.F.R.§226.17 (a) (1), "The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep." In their Motion, Plaintiffs point to several cases supporting their proposition that Defendant violated TILA by failing to disclose that negative amortization was a certainty, as opposed to a mere possibility. *Plascencia v. Lending 1st Mortgage*, No. 07-4485, 2008 U.S. Dist. LEXIS 87300, at *1, 8-19 (N.D. Cal. Apr. 28, 2008). In these cases, the courts found that the Defendants violated TILA when negative amortization was a certainty at the time of closing and not simply a possibility, and the Defendants failed to disclose this certainty. Therefore, in order for Plaintiffs to prevail on the merits of this claim, Plaintiffs must demonstrate that negative amortization was in fact a certainty from the outset.

Defendant alleges that Plaintiffs' claims under TILA regarding the failure to disclose the certainty of negative amortization is time barred. (Doc. No. 18 at 4). Defendant points to 15 U.S.C. §1640 (e) to support this claim. In pertinent part, 15 U.S.C. §1640 (e) reads: "Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation . . . ." 15 U.S.C.A. § 1640 (2010). This section pertains to actions for damages for violations of TILA. *See* 15 U.S.C.A. §1640 (a).

Plaintiffs respond to this defense by claiming that they are not seeking a damages remedy and that their claim for a preliminary injunction "stems from [their] claims for rescission under TILA. . . ." (Doc. No. 20 at 2). Under TILA, claims for rescission of a mortgage have a three year statute of limitations as opposed to a one year statute of limitations. 15 U.S.C.A. §1635 (f). However, the limitations period for rescission only extends to three years when the "required notice or material disclosures [describing the loan] are not delivered" to the Plaintiff as required

7

under 12 C.F.R. §226.23 (a)(3). 12 C.F.R. §226.23 (a)(3) (2010).

To determine whether the three year limitations periods pertaining to rescission covers defective amortization schedules, the Court must determine whether a defective amortization schedule falls within the ambit of "material disclosures" as contemplated in §223.23 (a)(3). The Court in *Mincey v. World Savings Bank, FSB*, 614 F.Supp 2d 610,633-35 (D.S.C. 2008) addressed this very issue. In *Mincey*, the Court held that failing to disclose that negative amortization was a certainty was not a "material disclosure" warranting rescission. *Id.* at 634-35 (citing *Mills v. Home Equity Group, Inc.*, 871 F.Supp. 1482, 1485 (D.D.C. 1994), holding that TILA required five material disclosures to be made: "1) the amount financed; 2) the finance charge; 3) the annual percentage rate; 4) the payment schedule; and 5) the total of payments. If these material disclosures are not made, then the consumer retains for three years the right to rescind the transaction.").

Using the *Mincey* court's decision as a guide, the Court should find that Plaintiffs' claim that TILA was violated because the amortization schedules were defective is time barred. Defective amortization disclosures do not extend the time to bring a claim for rescission. As such, a failure to disclose the certainty of negative amortization has a one year statute of limitations, which begins to run at the date of the occurrence. Court have held that "[i]f the violation is one of disclosure in a closed ended credit transaction, the date of the violation is no later than the date the plaintiff enters the loan agreement." *Id.* at 633 (citing *Davis v. Edgemere Fin. Co.*, 523 F.Supp. 1121 (D.Md. 1981). Thus, because the loan was closed on November 26, 2007, a claim for defective amortization disclosures must have been brought by November 26, 2008. Because this claim was not brought by this date, the claim is now time barred.

Plaintiffs direct the Court to no Maryland legal authority requiring disclosure of negative

8

amortization.

### ii. Plaintiffs' Claim that Defendant Failed to Provide Notice in Accordance with TILA

Plaintiffs second allegation arising under the Truth in Lending Act is that Defendants failed to provide them with notice in accordance with the provisions in TILA. Supporting this contention, Plaintiffs state that "TILA requires . . . a specific number of copies of notice of rescission to be provided to borrowers. Specifically, Regulation Z provides that 'in a transaction subject to rescission, as creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind.'" (Doc. 14 at 10). Plaintiffs claim that Defendant solely gave them one copy of their notice of the right to rescind their loan. *Id.* As a result of this supposed violation of TILA, Plaintiffs claim that the right to rescission has been extended to three years from the date that the loan was consummated. *Id.*

Under 15 U.S.C. §1635 (f), "An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding the fact that the information and forms required under this section or any other disclosures required under this part have not been delivered to the obligor." This section provides that " . . .[W]ritten acknowledgement of receipt of any disclosures required under this subchapter by a person to whom information, forms, and statement is required to be given pursuant to this section does no more than create a rebuttable presumption of delivery thereof." 15 U.S.C. §1635(c)(2010). Plaintiff acknowledges that "while there is a rebuttable presumption that if a borrower receives one copy of the notice, they received multiple copies, this presumption is overcome with sufficient evidence." (Doc. No. 14 at 11).

The Court in *Cooper v. First Government Mortg. and Investors Corp.*, 238 F.Supp.2d

9

50, 64 -65 (D.D.C.,2002) faced an analogous situation to the one *sub judice*. In *Cooper*, the Plaintiff received only one copy of her notice to rescind her loan with Defendant. *Id.* Defendant argued that Plaintiff received two copies of this form as required under TILA and that she signed a form acknowledging that she received two copies. *Id.* at 64. In *Cooper v. First Government Mortg. and Investors Corp.*, 238 F.Supp.2d 50, 64 -65 (D.D.C.,2002), the Court held that "[t]he borrower's written acknowledgement of receipt of the disclosures or documents required by TILA creates a rebuttable presumption of the delivery of such items." Describing this rebuttable presumption of delivery of two copies of the notice form, the Court in *Cooper* stated that ". . . the case-law demonstrates that a TILA plaintiff attempting to overcome the presumption of delivery of two copies of the Notice Form faces a low burden . . . Accordingly, the court determines that Ms. Williams' testimony is sufficient to overcome the presumption of delivery." (citations omitted). *Id.* Like in *Cooper*, in the case at bar, the testimony of the Plaintiff alleging that Defendant failed to provide a sufficient number of disclosures is sufficient to overcome the presumption of delivery.

However, even if the Plaintiff overcomes the presumption of delivery, Plaintiff must satisfy certain conditions in order to have the option of rescinding the loan. Namely, Plaintiffs must be able to tender the lender the full amount due under the loan. *See American Mortgage Network, Inc. v. Shelton*, 486 F.3d 815 (4th Cir. 2007). Thus, notifying the lender that the borrower desires to rescind the loan does not automatically cancel the loan. The borrower must be able to repay the net proceeds owed under the loan. *Id.* Rejecting the argument that unilateral notification of rescission of the loan automatically voided the loan contract, the Court in *American Mort.* held,

This Court declines to adopt the reasoning of the Eleventh Circuit in *Williams v.*

10

> *Homestake Mortgage Co.,* espousing the minority position that rescission is automatic, but holding that the voiding of a security interest may be judicially conditioned on debtor's tender of amount due under the loan. *See Williams,* 968 F.2d at 1141-42.

486 F.3d 815, 821 (4th Cir. 2007).

Defendants contend that Plaintiffs are not in a financial position to tender the full amounts owed to them under the loan, claiming that "Plaintiffs have not proffered that they have financial resources to consummate a rescission." (Doc. No. 18 at 6). Responding to this assertion, Plaintiffs state that they are now attempting to sell the property at issue, which currently has $1 million worth of equity. (Doc. No. 20). Plaintiffs have presented the following Tender Offer:

> They will auction the property off for several hundred thousand dollars under its market value, within approximately 90 days. If not sold, another auction will be held at a price of nearly $1 million less than its worth approximately 60 days later. During the entirety of this period, Plaintiffs will pay all escrows on the property.
>
> *Id.* at 5.

In *American Mortgage*, the Court indicated that the trial court had authority to set the terms of the rescission by allowing Plaintiffs time to repay the net loan proceeds. *American Mortg.*, 486 F.3d at 821. In crafting its decision, the Court notes that the "equitable goal of rescission under TILA is to restore the parties to the 'status quo ante.'" *Shetlon*, 486 F.3d at 820.

In *Benjamin*, plaintiffs sought a rescission of their loan based on the contention that the defendant, Nationwide Lending Corporation, failed to provide them with sufficient notification of their right to cancel their loan as mandated by TILA. 2010 WL 610768 at *1. Like in this case, Defendants sough that the Court create a schedule for their tender of the loan amounts by way of a sale of the property. *Id.* In *Benjamin*, the Court was not sufficiently convinced that the plaintiffs were entitled to a rescission remedy under TILA. *Id.* In that case, Plaintiff were in

11

default on their loan, they had remained in their home for several months after they had defaulted, the loans had been assigned to other mortgage companies, and the Plaintiffs had made no definite offer to tender the obligation owed to the Defendants other than suggesting a short sale to repay the loans. *Id.* at *4. Looking at these factors, the Court found that "it unlikely that a grant of the rescission remedy under TILA would serve the purpose of placing the parties in their respective positions before the execution of the loans." *Id.*

In the case at bar, like in *Benjamin*, no payment has been made on the loan for several months, Plaintiffs are in default on their loan, they have remained in the home since default, and their tender offer to the Defendant is conditioned on the sale of the home. Plaintiffs aver that

> [T]he property is currently on the market for $2.99 and the Malaks have paid more than $300,000 in interest and fees on the loan . . . . [O]nce recession [sic] occurs the Malaks are entitled to retain all monies received from the property in excess of the $2.5 million loan amount, as well as a refund of all interest and fees paid throughout the life of the loan. As such, the Malaks have at least $300,000 in equity interest in the property at issue.

The Court is not convinced that waiting until the home is sold would place the parties in the status quo ante. At this preliminary stage, the Court is not willing to grant the equitable rescission remedy as Plaintiffs are currently unable to repay their loan obligation and their future ability to repay is speculative at this point. Therefore, granting the rescission remedy at this point will not place the parties in their respective positions before the execution of the loans. As such, Plaintiffs have not demonstrated a likelihood of success on the merits of this claim.

The Court will briefly address Plaintiffs likelihood of succeeding on the merits of their remaining claims.

      ii.    **COUNT III: Negligent Misrepresentation**

In the third count in their complaint, Plaintiffs bring an action against Defendant for

negligent misrepresentation. Plaintiffs allege that "Defendant's affirmative representations as to the amount of the monthly escrow payments without qualifying those representations as based on the unimproved value of the property, breached the duty owed to Plaintiffs." (Doc. No. 14 at 13). Furthermore, Plaintiffs state that Defendants based their escrow analysis on the unimproved value of the property at issue despite the fact that they had an appraisal that " indicated that the value of the property was . . . $3.6 million based on the improvements and was aware of the recent construction on the property, rendering the prior valuation obsolete." *Id.* In sum, Plaintiffs allege that the Defendant "knew with certainty that the escrow estimate was "critically flawed, yet never advised Mr. Malak that the affirmative representation concerning the escrow could not and should not have been relied upon." *Id.* at 14.

To establish a prima facie case of negligent misrepresentation, the Plaintiff must establish the following:

1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Gross v. Sussex Inc.* 332 Md. 247, 259, 630 A.2d 1156, 1162 (Md.,1993.

### i. Defendant, owing a duty of care to the plaintiff, negligently asserts a false statement

The parties contest the issue of whether Defendants have a duty to the Plaintiffs sounding in tort law. To support their claim that Defendant owed them a duty of care sounding in tort, Plaintiffs cite *Jacques v. First Nat'l Bank*, 307 Md. 527, 540 (Md. 1986). In Jacques, the Court

held, "implicit in the undertaking of the Bank to process [a] loan application is the agreement to do so with reasonable care." *Id.* at 13. The *Jacques* court imposed a tort duty on Defendants. However, no Maryland court has decided to extend the holding in *Jacques*. More recent Maryland law has held that "[t]he relationship between a bank and its customer is contractual." *Lema v. Bank of America, N.A.*, 375 Md. 625, 638 (2003). Even assuming that Defendants do in fact owe Plaintiffs a duty sounding in tort, at this stage in the litigation, Plaintiffs offer insufficient evidence to establish a prima facie case of negligent misrepresentation.

Plaintiffs have failed to demonstrate the Defendants *negligently* asserted a *false* statement. Plaintiffs have not shown that Defendant failed to exercise ordinary care by basing the escrow payment schedule on the unimproved value of land. Moreover, Plaintiffs have not shown that the escrow payment schedule was *false* at the time this statement was given to Plaintiffs. In fact, all disclosure regarding escrow payments which were given to Plaintiffs clearly stated that the information given was an estimate of monthly escrow payments. The record before the Court up to this point does not indicate that the escrow analysis was a false statement or that Defendants did not use ordinary care in performing the escrow analysis. Additionally, Plaintiffs do not contend nor do they offer any evidence to show that the escrow analysis performed by the Defendant was negligently completed or based on known falsehoods. As such, Plaintiffs are unlikely to prevail on their negligent misrepresentation claim because they have not carried their burden in proving that Defendant negligently made a false statement.

> **ii. Defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury**

Plaintiffs have also failed to carry their burden on two other elements of the misrepresentation claim—that the plaintiff, justifiably, took action in reliance on the statement; and that the plaintiff suffered damage proximately caused by the defendant's negligence.

Plaintiffs aver that the Defendants intended for the Plaintiffs to rely upon the escrow estimates given to them. This contention appears accurate, as escrow estimates are given for the purpose of accomplishing a closing on the mortgage. However, the escrow estimates were simply that—estimates. Plaintiffs state that "had [they] been put on notice of the inherent unreliability of the escrow estimate, [they] would have been able to investigate other options or choose different loan products, or immediately put the house on the market. Instead, relying on the affirmative inherently flawed statements provided by Defendant, Mr. Malak proceeded with the closing." *Id.* at 15. As discussed above, Plaintiffs were aware that their escrow payment obligations were estimates which were subject to change.[1] Therefore, because the escrow payments in these statements were explicitly deemed "estimates," Plaintiffs unreasonably relied on the belief that they would be paying $834.13 a month in escrow payments. Plaintiffs should have been aware that this number would change because the figure was an estimate.

### iii. Plaintiff suffers Damage Proximately Caused by the Defendant's Negligence

Next, in order to establish a prima facie case of negligent misrepresentation, Plaintiffs must prove that they have been harmed because of their reliance on the Defendant's statement.

---

[1] Plaintiff's Exhibit 8 is the Estimated Monthly Escrow Payment disclosure offered by Defendant. The statement explicitly says, "Based on the *best information available at this time*, regarding your real estate taxes and insurance requirements, your initial payments may be estimated to be in the amount of $7,455.26.

. . . .

An escrow analysis will be performed and you will be sent an Initial Escrow Account Statement within 45 days of settlement. This statement will disclose what is *estimated* to be received and disbursed from your escrow account over the next 12 months." (Doc. No 14-9, at 1) (emphasis added).

Defendant alleges Plaintiffs used the loan from Defendants to refinance their home. Defendant claims that the Plaintiff would have owed the same amount of property taxes to Montgomery County even if they had never refinanced with Defendant. *Id.* Thus, Defendants contend that reliance on the escrow estimates did not harm Plaintiffs. Plaintiffs, on the other hand, contend that their reliance on Defendant's escrow analysis has caused them to face imminent foreclosure. As demonstrated above, there is no evidence that Defendant failed to exercise ordinary care when performing the escrow analysis, and as such, Plaintiffs have not established that Defendant's negligence was the proximate cause of their injury.

   **b. Irreparable harm**

To meet the test for irreparable harm, the party must show more than a mere *possibility* of harm. *Winter,* 129 S.Ct. at 375-76. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy . . . ." *Id.* Plaintiffs are currently attempting to sell their home, and they allege that if Defendants are allowed to initiate foreclosure proceedings on their home while the sale is pending, potential buyers will not pay the full offering price for their home, resulting in irreparable harm Plaintiffs assert that "[i]f the Defendant initiates a foreclosure proceeding while the sale is pending, it will prevent buyers from offering the full value and can reduce the ultimate saleable price 30%." (Doc. No. 14 at 16). Moreover, Plaintiffs allege that even if foreclosure proceedings were resolved in Plaintiff's favor, the proceeding would delay the sale of Plaintiff's home, again resulting in irreparable harm because buyers would be deterred from offering Plaintiffs their full asking price for the home. *Id.* Plaintiffs offer an affidavit from Krystyna Litwin, Plaintiff's real estate agent to support the claim that irreparable harm will result if a

foreclosure proceeding is initiated against them. Additionally, Janice Valois, a RE/MAX real estate agent testified during the hearing on this motion to the amount that a foreclosure would reduce the value of the property. Although the Court is aware that a foreclosure proceeding would likely reduce the value in the home, viewing the entire record, the Court is not convinced that Plaintiffs have equity in the home at issue. Therefore, the grant of a preliminary injunction will not work to save the equity in the Plaintiff's home, as the record before the Court shows that the equity does not exist, or is minimal, at best. Thus, the Court does not believe that irreparable harm will result from the denial of a preliminary injunction.

    c. **Balance of equities**

Plaintiffs allege that the balance of the equities tips in their favor because the Defendant is "in no danger of failing to recover the mortgage as a whole." (Doc. No. 14 at 17). Supporting this allegation, Plaintiffs believe that Defendants will recover what is owed to them whether the property is sold by foreclosure or voluntarily by Plaintiffs. *Id.* However, Plaintiffs believe that if the property is sold by foreclosure, then they will lose the equity in their home which constitutes their entire retirement savings. *Id.* Defendants counter this argument by alleging that the balance of the harms tips in their favor because they are the party that has complied with their obligations under the loan agreement, while Plaintiffs have not complied with their obligations and are now in default under the loan. (Doc. No. 18 at 13). Without further factual developments in this case, the parties appear to be similarly situated on this factor.

    d. **Public Interest**

In order to grant a preliminary injunction, the Court must find that granting the injunction would be in the public interest. Plaintiffs allege that it is in the public interest to prevent

17

mortgage companies from foreclosing when the company itself has underestimated payments due under the loan. (Doc No. 14 at 17). On the other hand, Defendants contend that it is in the public interest to enforce contracts privately negotiated by parties. (Doc. No. 18 at 15). As stated earlier, the grant of a preliminary injunction is an extraordinary remedy. *See Kendzierski v. Corey*, 615 F.Supp. 550, 551 (D.C.Ind.,1985) (quoting, *Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Products, Inc.,* 545 F.2d 1096, 1097 (7th Cir.1976)). The Plaintiffs have failed to sufficiently demonstrate that the defendants acted wrongfully in disclosing the amounts owed under the mortgage. Although the monthly escrow payments that Defendants estimated increased after several months, there is not sufficient evidence that Defendants negligently or maliciously failed to disclose the likelihood of this increase. From the facts of this case, a preliminary injunction will not serve the public interest when the party being enjoined has not acted illegally or outside of its contractual obligations. Therefore, Plaintiffs have not demonstrated that the grant of a preliminary injunction is in the public interest.

## CONCLUSION

In Conclusion, the Court should **DENY** the grant of a preliminary injunction because Plaintiffs have not satisfied all of the elements which warrant the grant of a preliminary injunction. An Order consistent with this Opinion will follow.


Date: October 20, 2010                                          /s/
                                                                Alexander Williams, Jr.
                                                                United States District Court